UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CENTER FOR TRANSITIONAL LIVING, LLC, <br>    *Plaintiff*, <br><br> v. <br><br> ADVANCED BEHAVIORAL HEALTH, INC., STATE OF CONNECTICUT, DEPARTMENT OF MENTAL HEALTH AND ADDICTION SERVICES, and STATE OF CONNECTICUT, DEPARTMENT OF SOCIAL SERVICES <br>    *Defendants*. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | 3:20-CV-01362 (KAD) <br><br><br><br><br> AUGUST 4, 2021 |

**MEMORANDUM OF DECISION**
**RE: ABH'S MOTION TO DISMISS, ECF NO. 30**

Kari A. Dooley, United States District Judge:

      This action arises out of the manner by which Advanced Behavioral Health, Inc. ("ABH") fulfills its role as an intermediary in the State of Connecticut Mental Health Waiver/Money Follows the Person (W.I.S.E.) Program (the "Waiver Program"), a program which, *inter alia,* provides in-home health care services to eligible participants. Plaintiff Center for Transitional Living, LLC ("CTL"), a provider of such services, brings claims against ABH, as well as the Connecticut Department of Mental Health and Addiction Services ("CTDMHAS") and the Connecticut Department of Social Services ("CTDSS") (collectively the "State Agency Defendants").[1] Plaintiff alleges discriminatory referral practices in violation of 42 U.S.C. § 1983 (Count I), 42 U.S.C. § 1981 (Count II), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* (Count III), and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat.

---

[1] The Court dismissed Plaintiff's claims against the State Agency Defendants on March 11, 2021. *See Center for Transitional Living, LLC v. Advanced Behavioral Health, Inc.*, 3:20-CV-01362 (KAD), 2021 WL 930082 (D. Conn. Mar. 11, 2021).

§ 42-110a *et seq.* (Count IV). Pending before the Court is ABH's motion to dismiss for lack of standing pursuant to Rule 12(b)(1) and failure to state a claim pursuant to Rule 12(b)(6). ABH also seeks dismissal of any claim for injunctive relief on the basis that any such claim is moot. The motion to dismiss was fully briefed as of January 28, 2021.[2]

**Allegations**

The State Agency Defendants are responsible for administering the Waiver Program as authorized by § 1915(c) of the Social Security Act. (Compl. ¶ 10.) The Waiver Program allows the State of Connecticut to provide home and community-based services to Medicaid beneficiaries, helping those individuals avoid institutional care. (Compl. ¶ 11.) ABH contracted with the State Agency Defendants to be the sole Connecticut Medicaid Billing Provider and fiscal intermediary for the program. (Compl. ¶¶ 12–13.) Plaintiff alleges that "[a]t all times relevant hereto, ABH acted as the agent of CTDMHAS and CTDSS in its administration of the Waiver Program." (Compl. ¶ 14.)

Plaintiff is a minority-owned home care agency that provides medical care and assistance to individuals living at home. (Compl. ¶ 9.) In May 2013, Plaintiff completed a Waiver Program Credentialing Application to participate in the Waiver Program and thereby become eligible to receive Medicaid funds. (Compl. ¶ 15.) Plaintiff alleges that CTDMHAS reviewed the application but that ABH credentialed Plaintiff for specific services. (Compl. ¶ 16.) On or about May 16, 2013, Plaintiff entered an agreement with ABH, in which Plaintiff would provide services under the Waiver Program to participants referred by ABH. (Compl. ¶ 17.) The agreement provided that ABH would facilitate payment for the Waiver Program services provided through the State Medicaid program, allegedly under the supervision of CTDMHAS and CTDSS. (Compl. ¶ 18.)

---

[2] No party requested, in accordance with D. Conn. L. Civ. R. 7(a), oral argument on this motion.

Plaintiff claims that since at least September 22, 2017, ABH has engaged in discriminatory referral practices and that these practices have deprived Plaintiff of service contracts under the Waiver Program. (Compl. ¶ 21.) Specifically, Plaintiff alleges that ABH passed along discriminatory client requests, *e.g.*, a client request that the service provider not be African-American, and that, when CTL refused to honor such requests, ABH retaliated by not referring prospective clients to Plaintiff. (Compl. ¶¶ 21, 24–25).

**Legal Standard**

"Article III restricts federal courts to the resolution of cases and controversies. . . . That restriction requires that the party invoking federal jurisdiction have *standing*—the personal interest that must exist at the commencement of the litigation." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 732 (2008)) (emphasis and alterations in *Carter*). "When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it . . . the plaintiff has no evidentiary burden." *Id.* at 56. The task of the district court is to determine whether, after accepting as true all material factual allegations of the complaint and drawing all reasonable inferences in favor of the plaintiff, the alleged facts affirmatively and plausibly suggest that the court has subject matter jurisdiction. *Id.* at 56–57. If, however, the Rule 12(b)(1) motion is fact-based and proffers evidence beyond the pleading and that evidence reveals factual questions as to the plaintiff's standing, then the plaintiff will generally need to come forward with evidence of its own to controvert that evidence. *Id.* at 57 (citations omitted). The plaintiff may rely on the allegations in the pleading if the evidence proffered is immaterial, however. *Id.*

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id.* Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Discussion**

***Rule 12(b)(1) Arguments***

The Constitution's case-or-controversy limitation on the federal judicial authority, Art. III, § 2, underpins both the standing and mootness aspects of a federal court's subject matter jurisdiction, but the two doctrines have critical differences. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). Although the Supreme Court has repeatedly described mootness as "the doctrine of standing set in a time frame" because "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness)," the Court has also acknowledged that this description is not comprehensive. *See Id.* at 189–90 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)) (further citations omitted). For example, the burdens under each doctrine are different. *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016). Whereas the burden of establishing standing falls on the plaintiff because standing

4

"functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake," the burden of showing mootness falls on the defendant, in part, because by the time mootness normally becomes an issue, the courts have already invested resources into litigating the matter. *Id.* at 603 (quoting *Laidlaw*, 528 U.S. at 190–92).

The "irreducible constitutional minimum" of standing has three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted). Mootness, for its part, generally implicates the redressability requirement of standing. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021) ("To demonstrate standing, the plaintiff must not only establish an injury that is fairly traceable to the challenged conduct but must also seek a remedy that redresses that injury. And if in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot.")

ABH first asserts that the prayer for injunctive relief should be dismissed as moot under the voluntary cessation doctrine because after ABH relayed Plaintiff's complaints of discrimination to CTDHMAS, CTDMHAS modified a patient intake form to prohibit participants from making discriminatory requests. "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Holland v. Goord*, 758 F.3d 215, 223–24 (2d Cir. 2014) (quoting *Already, LLC v. Nike*, 568 U.S. 85, 92 (2013)). Specifically, "[a] defendant's voluntary cessation of allegedly unlawful activities can render a claim for injunctive relief moot only if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged

5

violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Easterling v. Connecticut Dep't of Corrections*, 265 F.R.D. 45, 53 (D. Conn. 2010) (quotations and citations omitted).

Here, ABH has demonstrated neither. ABH has offered no evidence that if presented with another discriminatory request notwithstanding the updated intake form, ABH could not or would not repeat its alleged practice of accepting and passing along such discriminatory requests. Indeed, whether ABH receives fewer discriminatory requests from participants because of the changed intake form is beside the point. Although program participants are now told that discriminatory requests should not be made and will not be honored, and although this change may reduce the number of discriminatory requests, it does not guarantee that ABH will no longer receive or pass along discriminatory requests to service providers. Absent some reasonable showing that ABH will not repeat its behavior and that the changes that have occurred have eradicated the effects of ABH's practices, Plaintiff's claim for injunctive relief is a live controversy. *Compare Am. Freedom Defense Initiative v. Metro. Transp. Authority*, 815 F.3d 105, 110 (2d Cir. 2016) (finding no reasonable expectation of recurrence and no lingering injury where defendant had changed its polices and was collaterally estopped from applying its old policies to plaintiff).

ABH next challenges Plaintiff's standing on the ground that because it is the participants who file the discriminatory requests, Plaintiff's injury is not fairly traceable to ABH. ABH argues that it "was merely a conduit for any such requests in accordance with the directives of the participant in the Waiver Program." (Def.'s Mem. 13, ECF No. 30.) To demonstrate that the Plaintiff's injury is fairly traceable to the defendant's conduct, the plaintiff must show that "the injury was in some sense caused by the opponent's action or omission." *Cortland Street Recovery Corp. v. Hellas Telecommunications, S.à.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (citing *Lujan v.*

6

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Indeed, the fairly traceable requirement is not "an onerous standard" as "it is a standard lower than that of proximate causation." *Carter*, 822 F.3d at 55–56; *see also Otoe-Missouria Tribe of Indians v. New York State Dep't Fin. Services*, 974 F. Supp. 2d 353, 358 (S.D.N.Y. 2013) (noting that a plaintiff need not show that a defendant is the only cause of the plaintiff's injury) (citations omitted).

ABH conflates standing with the merits of the underlying claim. Indeed, ABH's characterization of itself as "merely a conduit" does not withstand scrutiny.[3] In addition to relaying discriminatory care requests, Plaintiff alleges that ABH stopped making referrals to Plaintiff after Plaintiff objected to the discriminatory requests. ABH is further alleged to be responsible for having "credentialed" Plaintiff, and the Affidavit of Dr. Moy and the documents attached thereto demonstrate that ABH actively managed the process by which requests were received and treatment providers selected. ABH cannot re-cast the Plaintiff's allegations and then assert that those allegations, as re-cast, defeat Plaintiff's standing. The Complaint and the favorable inferences drawn therefrom are sufficient to plausibly establish a causal nexus between ABH's conduct and Plaintiff's injury and, therefore, to provide Plaintiff with standing.

ABH's motion to dismiss the complaint for lack of standing and to dismiss the request for injunctive relief as moot is DENIED.

*Rule 12(b)(6)—Failure to State a Claim*

ABH also argues, in the alternative, that each of Plaintiff's four counts fail to state a claim upon which relief can be granted. ABH asserts that (1) ABH is not a state actor and so cannot be

---

[3] The Court does not decide whether, even if it is only alleged to be a mere conduit of overtly discriminatory requests, ABH would prevail on this dubious standing argument. The act of transmitting the discriminatory requests is, in and of itself, affirmative conduct. *See Nicholson v. Securitas Security Services USA, Inc.*, 830 F.3d 186, 189–90 (5th Cir. 2016) (finding that a joint client-employer's discrimination can be attributed to a staffing agency); *see also Lima v. Addeco*, 634 F. Supp. 2d 394, 401–02 (S.D.N.Y. 2009) (deciding a discrimination claim involving a staffing agency on the merits).

liable under § 1983;[4] (2) as to the § 1981 and Title VI claims, Plaintiff has not plausibly alleged that it is a racial minority or that ABH's alleged discriminatory conduct was intentional; and (3) Plaintiff's CUTPA claim should be dismissed on jurisdictional grounds once all of the federal claims are dismissed.

*Count I—42 U.S.C. § 1983 & State Action*

Title 42, U.S.C. Section 1983 provides in relevant part: "Every person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Accordingly, liability attaches under § 1983 only when a defendant acted under color of state law, and a private actor may not be held liable under § 1983 unless it was acting as an instrument of the state. *See, e.g.*, *Tancredi v. Metropolitan Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (citations omitted). "For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity has been delegated a public function by the [s]tate, ('the public function test')." *Sybalski v. Independent Group Home Living Program,*

---

[4] The parties briefed the question of whether ABH was a state actor as applicable to not only the § 1983 claims but also those brought under § 1981 and Title VI, but neither § 1981 nor Title VI have such a requirement. To the contrary, both claims can be pursued against private persons and entities. *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("It is established that Section 1981 prohibits discrimination based on race in the making and enforcement of contracts . . . and extends to private as well as state actors in that regard.") (citations omitted); *Shore v. Mirabilio*, No. 3:16-cv-2078 (VLB), 2018 WL 1582548, at *5 (D. Conn. Mar. 29, 2018) (indicating that Title VI was meant to cover those situations in which private entities that receive federal financial assistance engage in discriminatory behavior) (citations omitted).

*Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Brentwood Acad. v Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)). District courts, perhaps owing to the fact-intensive nature of this inquiry, have referred to these tests using different nomenclature or have departed from these tests where a mechanical application of the test did not adequately "fit" the case at bar. *See Doe v. Livanta LLC*, 489 F. Supp. 3d 11, 17–18 (E.D.N.Y. 2020) (citing *Alexander v. Azar*, --- F. Supp. 3d ---, 2020 WL 1430089, at *43–*48 (D. Conn. Mar. 24, 2020)); *Stefanoni v. Darien Little League, Inc.*, 101 F. Supp. 3d 160, 173–75 (D. Conn. 2014). In any event, "[t]he fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)) (further citations omitted).

When bringing a § 1983 claim against a private entity, "[i]t is not enough . . . for a plaintiff to plead state involvement in '*some activity* of the institution alleged to have inflicted injury upon a plaintiff'; rather, the plaintiff must allege that the state was involved 'with the *activity that caused the injury*.'" *Sybalski*, 546 F.3d at 257–58 (quoting *Schlein v. Milford Hospital, Inc.*, 561 F.2d 427, 428 (2d Cir. 1977)) (further citations omitted) (emphasis added in *Sybalski*); *see also Fabrikant*, 691 F.3d at 207 ("In analyzing whether a private entity acts under color of state law for purposes of § 1983, we begin 'by identifying the specific conduct of which the plaintiff complains,' rather than the general characteristics of the entity.") (quoting *Am. Manufacturers Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)). Further, the burden is on a plaintiff to demonstrate that a private entity has engaged in state action. *Szekeres v. Schaeffer*, 304 F. Supp. 2d 296, 311 (D. Conn. 2004).

In its opposition, Plaintiff skips the initial step of identifying the activity that caused its injury and instead discusses the attributes that render ABH a state actor generally. But the Court does not examine the relationship between the state and the defendant until it examines the injury-

9

producing conduct, which in this case appears at paragraphs 20–26 of the Complaint, a section titled "Discriminatory Conduct." Therein Plaintiff asserts that "[s]ince at least September 22, 2017, ABH has followed a policy and practice of discrimination in its referral practices by failing or refusing to refer clients to CTL because of its employees' race and/or national origin, either on its own initiative or in compliance with discriminatory client requests." Plaintiff next identifies several specific requests for treatment that were referred to CTL. One such request indicated that the client "will not work with any staff that have strong accents, cannot speak English or are African-American." Finally, Plaintiff asserts that "[i]n essence, ABH requested that CTL discriminate against its employees in job assignments on the basis of race and/or national origin and, following CTL's objections, retaliated against CTL by refusing to send referrals." Accordingly, the injury-causing activity at issue is discriminatory referral practices and the retaliatory refusal to make referrals. The next question is whether this specific conduct constitutes state action by ABH. *See Fabrikant*, 691 F.3d at 207.

Although Plaintiff cites to the various tests generally, it does not identify any particular theory under which ABH should be found to be a state actor. However, it is clear that Plaintiff relies upon the contract between ABH and the state as the basis for this claim. Plaintiff first points the Court to paragraph 30 of the Complaint, which states, "The discriminatory conduct complained of herein has been carried out under color of state law, and constitutes state action, because the State has contracted with ABH to administer the state-funded Waiver Program on its behalf and said program is overseen and supervised by CTDMHAS and CTDSS." Plaintiff also points to a series of supporting allegations, including that ABH acted as an agent for CTDMHAS and CTDSS, and to the portions of ABH's motion to dismiss indicating that CTDMHAS and CTDSS made changes to the informed consent waiver used by ABH. (Plf.'s Mem. 10–11, ECF No. 38.)

Ultimately, Plaintiff asserts, these allegations make ABH's conduct "fairly attributable" to the state for purposes of § 1983. The Court disagrees.

First, ABH cannot be deemed a state actor under the public function test. "Under the public function test, 'the exercise by a private entity of powers traditionally exclusively reserved to the [s]tate' can constitute 'state action.'" *Sybalski*, 546 F.3d at 259 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)) (emphasis in *Sybalski* removed). Under this test, "private actors must be delegated functions that were traditionally under the exclusive authority of the state." *Id.* However, "[t]he public function exception . . . is narrow" and is not satisfied simply because a private group is serving a "public function." *Hollman v. County of Suffolk*, No. 06-CV-3589 (JFB)(ARL), 2011 WL 2446428, at *5 (E.D.N.Y. June 15, 2011) (citing *Rendell–Baker*, 457 U.S. at 842). Indeed, few functions have been held to be public, *Lynch v. Southampton Animal Shelter Found. Inc.*, 971 F. Supp. 2d 340, 353 (E.D.N.Y. 2013), and those that have met the public functions test include providing medical care to prison inmates, holding local primary elections, animal control, operation of a post office, and fire protection. *See Gorgan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 265 (2d Cir. 2014) (citations omitted). Here, "administering welfare programs," even if such administration was a public function, cannot be said to have been traditionally and exclusively a state function. *See, e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982) (concluding that nursing homes do not perform a function that has been "traditionally the exclusive prerogative of the State") (quoting *Jackson*, 419 U.S. at 353); *Rendell-Baker*, 457 U.S. at 842 (concluding that although the education of "maladjusted high school students" was a public function, such education was not "traditionally the *exclusive* prerogative of the State") (citations omitted; emphasis in *Rendell-Baker*); *Sybalski*, 546 F.3d at 259 (concluding

11

that care for the mentally disabled was neither traditionally nor exclusively reserved to the state). Plaintiff advances no argument to the contrary.[5]

Plaintiff's argument appears to align most closely with the "joint activity/close nexus" test. *See Sybalski*, 546 F.3d at 257. Under this theory, state action may exist when the private entity's action is the result of "significant encouragement" by the state or joint activity with the state.[6] *Id.* Fatal to Plaintiff's claims in this regard is the alleged injury producing conduct, which, as discussed above is the starting point of the analysis. Here, there are no allegations that the state officials encouraged, jointly undertook or, frankly, even knew about ABH's allegedly discriminatory referral practices or retaliatory refusal to make referrals. As previously observed by the Court when dismissing the Title VI claims against the State Agency Defendants,

> [T]he Complaint contains no factual allegations that could demonstrate or even support the inference that the State Agency Defendants had actual knowledge of

---

[5] Nor does the Plaintiff argue that ABH is a state actor under the "compulsion test." "Under the 'compulsion test,' a nominally private entity may be considered a state actor when the party acted pursuant to the coercive power of the state or was controlled by the state." *Colabella v. Am. Inst. of Certified Public Accountants,* No. 10–cv–2291 (KAM)(ALC), 2011 WL 4532132, at *11 (E.D.N.Y. Sept. 28, 2011) (quoting *Sybalski,* 546 F.3d at 257). The "compulsion test" is satisfied if "a state exercise[s] coercive power or provide[s] such significant encouragement, either overt or covert, that the decision [by the private actor] must in law be deemed that of the State." *Miller v. Board of Managers of Whispering Pines at Colonial Woods Condominium II,* 457 F.Supp.2d 126, 130 (E.D.N.Y. 2006) (quotations, citations, and original alterations omitted); *see also Lynch*, 971 F. Supp. 2d at 349–50 (denying summary judgment where a material fact in dispute included whether the decision not to hire the plaintiff was made by the animal shelter or coerced by town officials). Further, "[t]he 'state compulsion' cases largely involve constitutional challenges to laws, customs, or policies adopted or enforced by private parties as a result of the state's command or encouragement," which is not the type of case before the Court. *See Sykes v. Bank of America*, 723 F.3d 399, 407 (2d Cir. 2013). And even if it were, mere acquiescence by the Government to a private actor's conduct is not sufficient to render that conduct governmental action. *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 546 (1987).

[6] A related but distinct "test" for state action is the "entwinement test." *See Grogan*, 768 F.3d at 268 (citing *Brentwood Academy*, 531 U.S. at 296). Under this theory "state action may exist when a private entity 'is entwined with governmental policies or when government is entwined in its management and control." *Id.* Such entwinement or control can be found where state officials serve, as a part of their official capacity, as leaders of the private entity. *See Brentwood Academy*, 596 U.S. at 299–300 (noting that eighty-four percent of a private association's membership consists of public schools official acting in their official capacity); *see also Lynch*, 971 F. Supp. 2d at 352 (explaining that state action can be found where the state controls the day-to-day operations and shares profits with the private actor). However, such entwinement may not be found when the private entity is simply a government contractor, even where the state is involved in the creation, funding, licensing, and regulation of the private entity. *See Grogan*, 768 F.3d at 268 (citations omitted). As with the other tests, what matters is the state's entwinement in the activity at issue. *See id.* (noting that the Circuit's conclusion that a library was a state actor in *Horvath v. Westport Library Association*, 362 F. 3d 147, 151–54 (2d Cir. 2004), rested on the town's entwinement with the funding and governance of the library, which rendered personnel decisions state action).

> ABH's alleged discriminatory conduct. . . . Nowhere does the complaint plausibly allege that either CTL or ABH notified the State Agency Defendants of any discrimination claims or practices.

*Center for Transitional Living, LLC*, 2021 WL 930082 at *4. Without this nexus, there is no state action. *See Sybalski*, 546 F.3d at 528 ("While the state has established substantive rights for patients in mental health facilities and procedures for protecting these rights, those actions, without more, do not amount to 'significant encouragement,' 'willful participa[tion]' or state 'entwin[ing]' . . . in **defendants' decision to restrict the Sybalskis' access to their son**.") (citation omitted; emphasis added; alterations in in *Sybalski*). The expanded record, wherein ABH asserts and Plaintiff confirms that CTDMHAS and CTDSS took affirmative steps to correct the discriminatory requests after learning about them, does not help Plaintiff. (Plf.'s Mem. 12, ECF No. 38.) The inference to be drawn from this point of agreement is that, far from "encouraging" or "jointly undertaking" discriminatory referrals as part of a common goal, the State acted reasonably to end the practice when the State became aware of it. *See Graham-Johnson v. City of Albany*, 471 F. Supp. 3d 506, 519–520 (N.D.N.Y. 2020) (noting that a private actor can only be a willful participant in joint activity with the state if the two share some common goal to violate the plaintiff's rights) (citations omitted).

Finally, the Court finds that, even setting aside the specific tests outlined in *Sybalski*, ABH's actions are not "fairly attributable" to the state. *Fabrikant*, 691 F.3d at 207. ABH is a private corporation that operates separately and distinctly from the state. Although it renders numerous services through contracts with the state, it does not, on these allegations, appear to be "fundamentally different from many [other] private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships or submarines for the government." *See Rendell-Baker*, 457 U.S. at 840–841. "Acts of such private contractors do not become acts of the

government by reason of their significant or even total engagement in performing public contracts," even if the contractor provides financial intermediary services rather than manufactured hard goods. *See id.*

The motion to dismiss Count One is GRANTED.

*Count II—42 U.S.C. § 1981 & Intentional Discrimination*

Title 42, U.S.C. Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." As the Supreme Court has stated, "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza v. McDonald*, 546 U.S. 470, 476 (2006).

A claim under § 1981 may be brought where a plaintiff alleges: "(1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the statutorily enumerated activities." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). However, the scope and availability of §1981 is wider than *Mian*'s three-element recitation implies. For example, "a plaintiff does not have to be a member of a racial minority to bring a claim under Section 1981; a non-minority plaintiff can allege personal injury stemming from a defendant's discriminatory conduct against a racial minority." *Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 476 (S.D.N.Y. 2013); *see also CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (holding that § 1981 protects against retaliation); *Albert v. Carovano*, 851 F.2d 561, 572–73 (2d Cir. 1988) (en banc)

14

("Under the caselaw, for example, non-minority plaintiffs may bring an action under Section 1981 against one who has retaliated against them because they did *not* engage in purposeful racial discrimination in a contractual or marital context.") (emphasis in original). Further, in regard to the statutorily-enumerated activities at stake, "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *See Domino's Pizza*, 546 U.S. at 476. Finally, a plaintiff also bears the burden of pleading, and ultimately proving, that but for race, it would not have suffered the loss of a legally protected right. *See Comcast Corp. v. National Ass'n of African-American-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

The parties' dispute whether Plaintiff's status as a corporation precludes it from having a racial identity for purposes of § 1981,[7] and if, assuming Plaintiff can have such an identity, Plaintiff's allegation that it is "minority-owned" is sufficient to establish that identity.[8] The parties also dispute whether the Complaint makes a plausible allegation of intentional discrimination.

---

[7] While acknowledging recent lower court decisions to the contrary, ABH argues, relying on dicta in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, that a corporation can have "no racial identity and cannot be the direct target of the [defendant's] alleged discrimination." 429 U.S. 252, 263 (1977). The Court notes, however, that the Supreme Court has subsequently recognized that it has not actually decided this issue, and further that the circuit courts to have considered it have held in favor of plaintiff corporations. *See Domino's Pizza*, 546 U.S. at 473 n.1 (citing *Hudson Valley Theatre, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982)). Additionally, in *Comcast Corp. v. National Ass'n of African American-Owned Media*, 140 S. Ct. 1009 (2020), the Supreme Court took up the question of the proper causation test for § 1981 claims. There, an African American-owned business brought discrimination claims under § 1981 against Comcast Corp. *Id.* at 1013. Because the case involved no natural persons and the alleged discrimination was directed at the corporation itself, by implication, a minority-owned corporate entity may have a racial identity capable of supporting a § 1981 claim. *See id.*

[8] On this issue, relying upon *Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988) and *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286 (2d Cir. 1992), ABH argues that Plaintiff must have alleged that "*all* members of its ownership and *all* members of its employees are members of a racial minority." (Def.'s Mem. 24, ECF No. 30.) (All emphasis in original.). But these cases do not require the outcome urged. First, *Jews for Jesus* involved a § 1985(3) claim, not a § 1981 claim. And because the plaintiff in *Jews for Jesus* was a "racially diverse society," the plaintiff could not, "by definition, constitute a racial class or maintain a claim as 'Jews.'" 968 F.2d at 292. *Carovano*, meanwhile, was a § 1981 case, and it found that twelve suspended college students failed to state a claim for relief under the statute. *Carovano*, 581 F.2d at 574. However, the *Carovano* Court confirmed that the pleadings were inadequate not because the students were not all racial minorities, but because they had inadequately alleged that their race was the cause of their injury. *See id.* at 572. Indeed, the allegations at issue "tend[ed] to contradict the race or ethnicity claim because they suggest[ed] that the sanction of suspension was imposed on all those who remained in Buttrick Hall without regard to their race or ethnicity." *Id.* Because CTL's § 1981 claim

15

Although Plaintiff defends its stake to a racial identity, the Court need not determine whether Plaintiff has adequately pled a racial identity in resolving the pending motion. Plaintiff has alleged, in part, that it suffered an injury because its employees are largely racial minorities. As Plaintiff succinctly asserts, "in passing along such discriminatory referral requests, ABH is essentially asking Plaintiff to discriminate against its own employees." (Plf.'s Opp. Mem. 8, ECF No. 38.) Plaintiff further alleges a retaliatory withholding of referrals as a result of Plaintiff's refusal to do so. *See Robledo*, 965 F. Supp. 2d at 476.

Instructive on this issue is *John and Vincent Arduini Inc. v. NYNEX*, 129 F. Supp. 2d 162 (N.D.N.Y. 2001). There, a cleaning company contended that a corporation's property manager interfered with the cleaning company's contracts following the cleaning company's decision to promote a Hispanic employee to a supervisory role rather than a Caucasian. *Id.* at 166. Following this promotion, the corporation's property manager allegedly refused to work with the Hispanic supervisor and forwarded "volumes of complaints about [the cleaning company's] performance" to other individuals at the corporation. *Id.* at 171. The corporation later refused to award a contract to the cleaning company, cancelled another contract early, and denied the cleaning company the opportunity to bid on three other contracts. *Id.* The court permitted the corporation's main § 1981 claim to proceed under these circumstances. *Id.* at 169–71. The Court sees no basis upon which a different outcome should obtain here, regardless of the racial identity of the corporate Plaintiff.

As to whether Plaintiff has plausibly plead that ABH acted with discriminatory intent, the Court finds that Plaintiff has done so. Although ABH asserts that paragraphs 35 and 36 of the Complaint are conclusory—and indeed, they are—this assertion overlooks the full nature of the allegations, which include that ABH received discriminatory requests and so was aware that

---

survives on other grounds, the Court does not decide what a limited liability company must plead, and ultimately prove, to be considered a racial minority.

16

participants were making those requests; that ABH in turn passed those discriminatory requests on to the Plaintiff; that Plaintiff specifically advised ABH that the requests were discriminatory and would not be honored; and that ABH, as a result of Plaintiff's notifications and refusals to comply, withheld referrals from Plaintiff. These allegations support the inference that ABH's alleged discrimination was intentional and not the result of some benign motivation. *See Twombly*, 540 U.S. at 554; *see also Littlejohn v. City of New York*, 795 F.3d 297, 315–16 (2d Cir. 2015) (setting out the elements of a retaliation claim).

Finally, and in keeping with the later developments in § 1981 claims, the Court observes that the Complaint plausibly alleges that Plaintiff's contractual relationships with its employees, Plaintiff's contractual relationship with ABH, and Plaintiff's potential contractual relationships with program participants were all possibly affected by ABH's discriminatory conduct. *See Domino's Pizza*, 546 U.S. at 476. Indeed, Plaintiff alleges that but for its employees' race and its refusal to discriminate against its own employees, Plaintiff would have had the opportunity to reap the benefits of those potential contracts with program participants. *See Comcast Corp.*, 140 S. Ct. at 1019.

The motion to dismiss Count II is DENIED.

*Count III—Title VI of the Civil Rights Act (42 U.S.C. § 2000d) & Intentional Discrimination*

Title VI "prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). The statute only prohibits intentional discrimination. *Id.*; *see also Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) ("[I]t is similarly beyond dispute . . . that [42 U.S.C. § 2000d] prohibits only intentional discrimination."). Consequently, "[a] substantive violation of Title VI occurs when (1) . . . there is racial or [other prohibited] discrimination and (2) the entity engaging in discrimination

is receiving federal funds." *Rafi v. Yale University School of Medicine*, No. 3:14-CV-01582 (VAB), 2017 WL 3205548, at *11 (D. Conn. July 27, 2017) (citation and quotation omitted). *See also Baker v. Board of Regents of the State of Kansas*, 991 F.2d 628, 631 (10th Cir. 1993) (adopting these two elements as those necessary to establish a Title VI cause of action).

ABH makes two arguments concerning Plaintiff's Title VI claim. ABH first argues that Plaintiff has failed to plausibly allege that ABH's conduct was intentional discrimination, an issue dispensed with above. Then, focusing on paragraph 44 of the Complaint, ABH states that Plaintiff has failed to plausibly allege disparate treatment because Plaintiff has not alleged that ABH treated any similarly situated entities differently than Plaintiff.

Although evidence of disparate treatment might have probative or evidentiary value, allegations of disparate treatment are not a prerequisite to pleading a claim under Title VI. *E.g.*, *Katchur v. Thomas Jefferson University*, 354 F. Supp. 3d 655, 665–66 (E.D. Pa. 2019) (stating that allegations of direct evidence of discrimination alone may support a Title VI claim). Accordingly, the failure to adequately identify comparators when a disparate treatment allegation is made is not a basis upon which to dismiss a Title VI claim that is otherwise adequately pleaded. Here, there is no question that the federal funding element is adequately pleaded and as discussed above, the Plaintiff has adequately alleged intentional discrimination. The motion to dismiss Count Three is DENIED.

<u>*Count IV—Connecticut Unfair Trade Practices Act & Supplemental Jurisdiction*</u>

Finally, ABH argues only that if all of the other claims have been dismissed, then the Court should decline to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's CUTPA claim in Count IV. Because the Court has not dismissed every federal cause of action and,

18

at this stage of the litigation, the CUTPA claim appears to possess a common nucleus of operative facts with the federal claims, ABH's motion to dismiss is DENIED as to Count IV.

**CONCLUSION**

For the foregoing reasons, ABH's motion to dismiss is DENIED in part and GRANTED in part.

**SO ORDERED** at Bridgeport, Connecticut, this 4th day of August 2021.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE